**COOPERATIVE ASSOCIATION NO. 37, Plaintiff-Respondent,**

v.

**ST. LOUIS–SAN FRANCISCO RAILWAY COMPANY, Defendant-Appellant,**

and

**Centropolis Transfer Company, Respondent.**

**No. 10515.**

Missouri Court of Appeals, Southern District, Division One.

Dec. 3, 1979.

Motion for Rehearing or to Transfer Denied Dec. 28, 1979.

Application to Transfer Denied Jan. 15, 1980.

Gerald D. Morris, Donald E. Engle, St. Louis, C. Wallace Walter, Springfield, for defendant-appellant.

Raymond E. Whiteaker, Woolsey, Fisher, Clark, Whiteaker & Stenger, Meredith B. Turner, Springfield, Donald L. Shughart, Timothy J. Verhagen, Kansas City, for plaintiff-respondent.

PER CURIAM.

On November 17, 1973, St. Louis-San Francisco Railway Company (Frisco) had three parallel sets of railroad tracks running east and west through Fordland, Missouri. The tracks intersect north-south Center Street at grade. The team track, used for unloading, is southernmost, the passing track is in the middle and the main-line track is northernmost. Plaintiff, per lease agreement with Frisco, maintained a warehouse located on Frisco's right-of-way just south of the team track and west of Center Street. Per a license agreement with Frisco, Centropolis Transfer Company (Centropolis) carried on a cement unloading operation on the team track east of Center Street wherein cement was unloaded from hopper cars into pits beneath the team track and in turn, via augers, was loaded into tractor-trailer rigs owned by Centropolis.

At the time of the casualty in question, three cement hopper cars were standing on the team track east of Center Street and similar cars were on the team track west of Center Street. Depending upon estimates of several witnesses, the first of the three hopper cars was 30 to 100 feet east of Center Street. A six-car work train was standing on the middle or passing track east of Center Street. The first car of the work train was estimated to be anywhere from 30 to 200 feet east of Center Street.

The accident occurred when Frisco's train, traveling west on the main-line or northernmost track, collided with Centropolis' northbound truck which was traveling on Center Street and crossing the railroad tracks. The ensuing derailment of Frisco's cars caused damage to plaintiff's warehouse located at the southwest corner of the intersection of Center Street and the above-de-

scribed railroad tracks. Plaintiff sued Frisco and Centropolis. Frisco counterclaimed on the basis of an indemnification clause contained in its lease with plaintiff and cross-claimed against Centropolis on the basis of the license agreement and on theories of negligence. Centropolis crossclaimed against Frisco alleging it was negligent in several respects. In accordance with jury verdicts, a $34,000 judgment was entered for plaintiff against both defendants, in favor of plaintiff on Frisco's counterclaim, in favor of Centropolis on Frisco's cross-claim and in favor of Frisco on the cross-claim of Centropolis. Frisco appealed.

## I

Frisco's first point relied on is that the trial court erred in denying Frisco's motion for directed verdict made at the close of all the evidence and in denying Frisco's motion for judgment notwithstanding the verdict with respect to plaintiff's claim against Frisco for the reason, in essence that a certain provision of a lease agreement dated May 21, 1928, entitled Frisco to the relief sought by the denied motions.

The parties agreed that the lease dated May 21, 1928, was in full force and effect between plaintiff and Frisco on the date of the collision of November 17, 1973. Paragraph 11 of the lease is set forth marginally.[1] Lease provisions of that general nature are discussed in *Tri-State Gas Co. v. Kansas City Southern Railway Co.*, 484 S.W.2d 252 (Mo.1972). There the supreme court stated,

at p. 253: "Leasehold provisions by which railroads are exempted from the consequences of their own negligence are valid and binding on the parties."

Paragraph 11 contains two sentences. Neither is a paragon of brevity.

In the first sentence lessee (plaintiff) agrees to "assume" four enumerated categories of damages. They are:

(1) All damages resulting from want or failure at any time of title on the part of [Frisco] to any part of the leased premises;

(2) All damages resulting from fire communicated from the right of way, locomotives or other machinery of [Frisco], or otherwise, to any buildings, structures, improvements, or other property of any kind or character that may now or hereafter be upon said leased premises, or any part thereof, and to whomsoever the same may belong;

(3) All damages resulting from death of or injury to [plaintiff], or any of [plaintiff's] agents, servants or employees, and any and all other persons, while upon said leased premises, or any part thereof;

(4) Loss or destruction of or damage to any buildings, structures, improvements or other property of any kind or character that may now or hereafter be upon said leased premises, or any part thereof, and to whomsoever the same may belong, caused by or resulting in any manner from the operation or maintenance of said railroad.

1. "In consideration of the privileges hereby given Lessee to occupy and use the ground of Lessor hereinabove described, and of the benefits and privileges to be derived therefrom, and of the rental herein provided, Lessee hereby covenants and agrees to assume all damages resulting from want or failure at any time of title on the part of Lessor to any part of the leased premises, and all damages resulting from fire communicated from the right of way, locomotives or other machinery of Lessor, or otherwise, to any buildings, structures, improvements or other property of any kind or character that may now or hereafter be upon said leased premises, or any part thereof, and to whomsoever the same may belong, and all damages resulting from death of or injury to Lessee, or any of Lessee's agents, servants or employees, and any and all other persons,

while upon said leased premises, or any part thereof, and loss or destruction of or damage to any buildings, structures improvements or other property of any kind or character that may now or hereafter be upon said leased premises, or any part thereof, and to whomsoever the same may belong, caused by or resulting in any manner from the operation or maintenance of said railroad; whether any such damage shall be caused by the negligence of Lessor, or any of its agents, servants, or employees, or otherwise. Lessee hereby further covenants and agrees to release, and does hereby release, and to protect, save harmless and indemnify, Lessor from and against any and all damages in this paragraph referred to, and all claims, demands, causes of action, suits, judgments, attorneys' fees, costs and expenses on account thereof."

Categories 2 and 4 deal with certain described erections. Category 2 covers damage resulting from fire communicated from the right of way or machinery of Frisco, "or otherwise," to the erections. Category 4 deals with damage (or loss or destruction) to the erections "caused by or resulting in any manner from" the operation or maintenance of the railroad.

Category 2 is confined to damage resulting from fire but whether that fire was caused by the operation or maintenance of the railroad is immaterial. Category 4 is confined to damage connected with the operation or maintenance of the railroad but whether the damage resulted from fire is immaterial. Obviously some situations could involve both categories.

The last clause in the first sentence is separated from the preceding portions by the only semicolon in that prolix sentence. That clause provides, in essence, that the plaintiff "assumes" each of the four enumerated varieties of damages whether or not any of them is caused by the negligence of Frisco or its agents, servants or employees.

In the second sentence of paragraph 11 plaintiff releases Frisco from liability for each of the four categories of damages. That sentence also includes an agreement to indemnify.

In the case at bar plaintiff's warehouse, located on the leased premises, was damaged by reason of the collision between the Frisco train and the truck. No fire was involved so category 2 is not involved. Category 4 is involved if it may properly be said that the damage to the warehouse was "caused by or result[ed] in any manner from the operation or maintenance of said railroad."

■ Plaintiff's petition pleaded, and the jury found, that the negligence of Frisco's train combined with the negligence of Centropolis' truck driver to cause the collision. There would be no validity in an argument that category 4 is confined to situations where the damage was *solely* caused by Frisco's negligence. That is true because the last clause in the first sentence makes the negligence or non-negligence of Frisco immaterial in determining whether category 4, or any of the other categories, is involved. The fact that the damage was caused by the *concurrent* negligence of Frisco and Centropolis does not remove the situation at bar from category 4. That category covers damages to the erections "caused by *or resulting in any manner from the operation*" of the railroad.

Category 4 applies to the instant facts and Frisco is not liable to plaintiff.

Frisco's first point is a meritorious one. That portion of the judgment which was in favor of plaintiff and against defendant Frisco on the petition must be reversed. Frisco has not requested any other or additional appellate relief with respect to its counterclaim against plaintiff.

## II

Frisco's second point relied on challenges the correctness of Instruction No. 3, plaintiff's verdict-directing instruction, submitting its claim against Frisco. The disposition of Frisco's first point renders its second point moot.

## III

■ Frisco's third point relied on reads: "The trial court erred in failing to sustain Frisco's post-trial motion for judgment in accordance with its motion for a directed verdict on Counts II and IV of its cross-claim against Centropolis at the close of all the evidence for the reason that Frisco was entitled to such relief as a matter of law because of a legal, valid, and binding license agreement between Frisco and Centropolis whereby, under the circumstances of this case, Centropolis was obligated to Frisco for the amount of loss sustained by Frisco, as claimed in Counts II and IV of Frisco's crossclaim."

As written, the point violates the basic requirements of Rule 84.04(d), V.A.M.R., which are mandatory. *Barber v. M. F. A. Milling Co.*, 536 S.W.2d 208, 209[1] (Mo.App. 1976). It does not set forth "wherein and

why" the trial court erred except for the conclusory statement that Frisco was entitled to relief as a matter of law because of the license agreement. *State ex rel. Zoological Pk. Subd., St. Louis v. Jordan,* 521 S.W.2d 369, 373[7] (Mo.1975). "Wherein and why" the license agreement entitled Frisco to relief against Centropolis is left to speculation and conjecture. The only way we could come by the meaning of this abstraction is to resort to a search of either the transcript on appeal or the argument portion of Frisco's brief. We are not required to do either. *Butterbaugh v. Public Water Supply Dist. No. 12,* 512 S.W.2d 445, 447[3] (Mo.App.1974); *In re Estate of Barks,* 488 S.W.2d 928, 930[5] (Mo.App. 1972). Nonetheless, it suffices to say that the licensing agreement between Frisco and Centropolis does not expressly and unequivocally obligate Centropolis to indemnify and save Frisco harmless from the particular loss suffered in this case. The agreement, in particular, was only against "loss . . resulting from or incident to the construction, maintenance, operation, use or existence of said unloading pit," etc. Such a situation did not occur. Cf. *Kansas City Power & Light Co. v. Federal Const. Corp.,* 351 S.W.2d 741, 745[2] (Mo.1961); *Paro v. Pennsylvania Railroad Co.,* 348 S.W.2d 613, 614–615 (Mo.App.1961); *Thomas v. Skelly Oil Company,* 344 S.W.2d 320, 321 (Mo.App. 1960).

## IV

Frisco's fourth point is anomalistic at best. It complains of the trial court's refusal to give its proffered instructions C, D and E. However, in its argument to this point Frisco states: "The trial court refused these instructions because they are drawn to submit issues concerning the license agreement between Centropolis and Frisco and he believed that all such questions were matters of law to be decided by the Court . . . Frisco must admit, in all candor, that it believes that the trial court is correct; the issues presented by the [refused instructions concerning the] license agreement are matters of law for the Court." If Frisco admits the correctness of the trial

court's refusal, who are we to say otherwise? "The interpretation of a contract on the basis of its express language presents a legal issue for the court." *Slotkin v. Willmering,* 464 F.2d 418, 423[9] (8th Cir. 1972).

## V

Frisco next complains of Instruction No. 7 given on behalf of Centropolis relative to its defense of Frisco's crossclaim. The charge reads: "Your finding must be for defendant Centropolis on defendant Frisco's cross-claim as submitted in Instruction Number 6 if you believe: First, defendant Frisco either: operated its train at an excessive speed, or operated its train at a speed which made it impossible for it to stop within the range of the engineer's visibility, or operated its train toward the Center Street intersection without first giving an adequate and timely warning, or obstructed the vision [of the driver of Centropolis' truck] of the approach of defendant Frisco's train, . . ."

It will be noted that the instruction contains four assignments of negligence submitted in the disjunctive. It is axiomatic that when this occurs and the submission of one assignment of negligence is erroneous, the instruction is erroneous because the verdict may have been based upon the erroneous submission. *Beckwith v. Standard Oil Company,* 281 S.W.2d 852, 856[8] (Mo.1955); *Leonard v. Gordon's Transport, Inc.,* 575 S.W.2d 244, 247[1] (Mo.App.1978); *Schneider v. Finley,* 553 S.W.2d 727, 730[2] (Mo. App.1977); Missouri Approved Jury Instructions (MAI) 1.02, Committee's Comment at 7 (2d ed. 1969).

Tending directly to the disjunctive submission that Centropolis could not be liable on Frisco's crossclaim if Frisco "operated its train at a speed which made it impossible for it to stop within the range of the engineer's visibility," we must bear in mind that it was Frisco's right-of-way (not Centropolis') on which the train was being operated, that it would be most impracticable always to run a national system of railroads at such speeds as would permit

trains to be stopped within the range of the engineer's visibility and that it is to the general public's interest that trains operate on some semblance of a time schedule. Therefore, it has been held that railroads, dissimilar to automobile drivers on public highways, have no general duty to operate their trains at such speeds that they can always stop within the range of the engineer's visibility. *Owens v. Chicago, Rock Island and Pacific Railroad Co.*, 292 F.2d 696, 697[4] (10th Cir. 1961); *Chicago Rock Island & P. R. Co. v. Hugh Breeding, Inc.*, 247 F.2d 217, 224–225[5] (10th Cir. 1957); *Johnson v. Killion*, 179 Kan. 571, 297 P.2d 177, 179[2, 3] (1956) and cases there cited; *McGlinchey v. Baker*, 356 F.Supp. 1134, 1143 (E.D.Pa.1973); *Shaffer v. New York Cent. R. Co.*, 66 Ohio App. 417, 34 N.E.2d 792, 794[2] (1940); Annot., Negligence—Speed of Train at Crossing, 154 A.L.R. 212, 229–230; cf. *Theriot v. Texas and New Orleans Railroad Co.*, 220 So.2d 563, 568[4] (La.App.1969). The disjunctive submission was error.

## VI

In Frisco's sixth point it asserts that the trial court committed error in admitting, over Frisco's objection, certain testimony adduced by plaintiff. For the reason that the issues may not arise at all or in the same manner on the new trial of Frisco's crossclaim against Centropolis, the sixth point need not be considered.

For the reasons stated that portion of the judgment which was in favor of plaintiff and against defendant Frisco on plaintiff's petition is reversed; that portion of the judgment which was in favor of Centropolis on Frisco's crossclaim against Centropolis is reversed and remanded; in all other respects the judgment is affirmed.

The cause is remanded for a new trial only on the issues relating to the crossclaim of Frisco against Centropolis. It is so ordered.

All concur except TITUS, J., who dissents and files dissenting opinion.

TITUS, Judge (dissenting).

I respectfully dissent to the ruling on Frisco's first point relied on and, of necessity, on the conclusion that the majority holding as to that point renders the second point moot.

By paragraph 11 of the lease, plaintiff agreed to assume, even if caused by Frisco's negligence, "all damages [to structures on the leased premises] resulting from fire communicated from the right of way, locomotives or other machinery of [Frisco] or otherwise . . . and damage to any buildings . . . caused by or resulting in any manner from the operation or maintenance of said railroad." In the second sentence of paragraph 11, the parties have attempted the unlikely undertaking of both releasing Frisco from liability which plaintiff had agreed to assume and indemnifying Frisco for liability otherwise assumed or released by plaintiff. In such an apparently absurd situation, the meaning and scope of the paragraph must be determined based upon the intent of the parties when the lease was made. *Tri-State Gas Co. v. Kansas City Southern Railway Co.*, 484 S.W.2d 252, 253–254[1, 2] (Mo.1972).

The lease agreement between Frisco and plaintiff is dated May 21, 1928. A reading of § 537.380, RSMo 1978, related and predecessor statutes thereto and reported cases digested under 24A Mo.Dig. Key Number 453 et seq., Railroads, attests to the liability and volume of litigation to which railroads were subjected, at and near the birth of the lease in question, because of loss by fire communicated by coal burning-steam driven locomotive engines. Before oil came into use to fuel locomotive engines, courts took judicial notice that locomotives emitted "sparks in sufficient quantities to communicate fire to combustible materials on which they happen to fall; that the quantity of sparks emitted depends on a number of conditions; that certain types of sparks arresters are in general use on the railroads of the country; and that no device has been invented or constructed which can wholly prevent a locomotive from throwing off live sparks under certain circumstances." 31

C.J.S. *Evidence*, § 29, at 924 and cases there cited. Considering the wording of the contract, the time (1928) and the prevailing circumstances in esse when the lease was executed, it seems clear that the specific and primary concern of Frisco was to seek legal absolution from "all damages resulting from fire." Under the rule of ejusdem generis, the general term relating to damages "caused by or resulting in any manner" is nothing more than a "clean up" or "otherwise" phrase with respect to the specific reference to "fire" which preceded it. Limited and specific clauses in contracts operate as a modification and pro tanto nullification of general terms and provisions. *State ex rel. Smith v. City of Springfield*, 375 S.W.2d 84, 91[2] (Mo. banc 1964); *In re Marriage of Buchmiller*, 566 S.W.2d 256, 259[6] (Mo.App.1978); 28 C.J.S. *Ejusdem generis*, pp. 1049–1050; 17 Am.Jur.2d, Contracts, § 270, pp. 677–679.

As to the indemnity aspect of the lease, it is to be again noted that Frisco's train which figured in the collision was traveling west on the northernmost or main-line track. The ensuing derailment caused train cars to strike and derail hopper cars standing west of the intersection on the southernmost or team track and these, in turn, are what damaged plaintiff's building.

"It is clear that two parties may enter into a valid contract whereby one is indemnified by the other against loss by the former (indemnitee) as the result of his own negligence. . . . [The] law has wisely required that such broad and comprehensive indemnification agreement be expressed in clear, unequivocal and unambiguous terms. Courts in Missouri have not (and should not) construe such an indemnity contract, protecting against negligence, in the absence of such clear expression or where any doubt exists as to the intention of the parties." *Southwestern Bell Tel. Co. v. J. A. Tobin Const. Co.*, 536 S.W.2d 881, 884–885[2, 3] (Mo.App.1976). There are no clear, unequivocal and unambiguous terms in the agreement which contemplate or cover the casualty in question. The indemnification in the second sentence of paragraph 11 of the lease simply alludes to "all damages in

this paragraph referred to." As already seen, the only clear expression in reference to damages is loss resulting from fire, a loss which did not occur here. "[M]ere general, broad, and seemingly all-inclusive language in the indemnifying agreement is not sufficient to impose liability for the indemnitee's own negligence." *Kansas City Power & Light Co. v. Federal Const. Corp.*, 351 S.W.2d 741, 745[2] (Mo.1961). Frisco's first point, in my opinion, should be denied.

In view of my dissent regarding Frisco's first point relied on, supra, its challenging of the correctness of plaintiff's verdict directing instruction does not make moot Frisco's second point.

Frisco's second point relied on and the argument thereto are prolix and difficult for full comprehension. In substance, Frisco's point asserts the trial court erred in giving plaintiff's instruction number 3 because it permitted the jury to find Frisco negligent for failing "to cause its trains to be operated at more a [sic] restricted speed" and "for failing to have electronic signals at the crossing", when such issues were unpleaded and not supported by the evidence. The difficulty of comprehending the point becomes self-evident when plaintiff's allegations of Frisco's negligence and instruction numbered 3 are considered together.

Inter alia, plaintiff's petition averred that Frisco was negligent because it "operated said freight train at an excessive and dangerous rate of speed [and] failed to sound a warning." Instruction No. 3 charged the jury to find for plaintiff against Frisco if it believed "Frisco either: operated its train at an excessive speed, or operated its train toward the Center Street intersection without first giving an adequate and timely warning . . . ."

The speed tape on Frisco's train showed the train was traveling 48 to 49 m. p. h. when it collided with Centropolis' truck at the grade crossing. Frisco's self-concocted speed limit at the crossing was 55 m. p. h. Based on this, albeit there was no question that the train was being operated by Frisco's engineer, Frisco theorizes, in a most

strained fashion, that since the instruction did not refer to the train being run by an engineer or agent of Frisco, the charge that the train was being run at an excessive speed could be jury-interpreted as an instruction that Frisco failed "to have in force and effect a more restrictive speed limit through Fordland and across Center Street than 55 Miles Per Hour." The uniqueness of this assertion is matched only by its implausibility. Irrespective of speed limits, whether self-imposed or set by statutes or ordinances, the ultimate issue for determination was not whether Frisco was negligent in not having a more restrictive speed limit than 55 m. p. h., but whether the train, under the then existing circumstances, was being operated at an excessive speed and that is exactly what the instruction submitted. Cf. *Dorrel v. Moore*, 504 S.W.2d 174, 179[8] (Mo.App.1973); *Rakestraw v. Norris*, 478 S.W.2d 409, 415[9] (Mo. App.1972). "What . . . constitutes excessive or dangerous speed by a railroad engine or train, in passing over a crossing, is always dependent upon the facts or surrounding circumstances of the particular case, and by this rule will the character of the engine's speed be measured." *Beal v. Chicago, B. & Q. R. Co.*, 285 S.W. 482, 485[3] (Mo.1926). Furthermore, if Frisco feared the instruction was susceptible to misunderstanding, it was incumbent upon Frisco to submit an explanatory or modifying instruction before it can be heard to complain. Frisco offered no such instruction. *Barber v. M. F. A. Milling Co.*, 536 S.W.2d 208, 210[7] (Mo.App.1976).

Frisco's second part of point II refers to that portion of Instruction No. 3 which alternatively allowed plaintiff recovery if Frisco "operated its train toward the Center Street intersection without first giving an adequate and timely warning." Because the jury had leave to believe all, part or none of the testimony of any witness [*Robinson v. St. John's Medical Center, Joplin*, 508 S.W.2d 7, 11[3] (Mo.App.1974)], Frisco tacitly cedes it would have been proper to give the instruction had the issue been solely confined to whether Frisco did or did not give an adequate and timely warning by bell or whistle. However, Frisco urges that, in view of objected-to evidence that "there were no electronic signals at the intersection", the instruction prompted the injection of the issue as to whether Frisco "should have had electronic signals at the intersection" when such had not been pleaded as a charge of negligence.

The duties, statutory and at common law, of railroads to signal the approach of trains at public crossings are ably stated by Gunn, J., in *Koehler v. Burlington Northern, Inc.*, 573 S.W.2d 938, 943–944[4–11] (Mo.App. 1978), and need not be repeated here. In the instant case testimony anent the absence of electronic signals at the crossing was simply evidence of surrounding circumstances which was relevant both to a determination of whether Frisco's train was being operated at an excessive speed and to the means or adequacy of a warning. Plaintiff did not plead nor argue that any duty rested on Frisco to have given any kind of warning other than a whistle or a bell. Defendants in *Hackett v. Wabash Railroad Company*, 271 S.W.2d 573, 577, 579[13] (Mo.1954), concerning plaintiff's instruction regarding defendants' duty "to give a timely and adequate warning of the approach of a train," asserted the charge gave the jury a "roving commission" to determine the kind of warning that should have been given. To this, the court said: "In making this contention, defendants-appellants say the jury may have believed the testimony of defendants' witnesses that a whistle and bell were sounded and yet have found for plaintiff on the theory that other means of warning should have been utilized at the crossing, for examples—a flagman, a gate, or an automatic bell or other automatic warning system. . . . [P]laintiff did not argue that any duty rested on defendants to have given any kind of a warning other than by whistle or bell. Plaintiff did not plead or contend the circumstances demanded the duty to take the precaution of using any means of warning other than by whistle or bell. We believe there is no real substance in this contention." I likewise believe there is no real substance in the

second portion of defendant's point II and the same should be denied.

For the reasons aforesaid, I dissent.